UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 14-23282-CIV-LENARD-GOODMAN

**CHICKEN KITCHEN USA, LLC, as
assignee of THREE CHEFS AND A
CHICKEN, INC.,**

    Plaintiff,

vs.

**MAIDEN SPECIALTY INSURANCE
COMPANY,**

    Defendant.
_____/

## FIRST AMENDED COMPLAINT

Plaintiff Chicken Kitchen USA, LLC ("Chicken Kitchen"), as assignee of Three Chefs and a Chicken, Inc. ("Three Chefs"), sues Defendant Maiden Specialty Insurance Company ("Maiden"), as follows:[1]

## NATURE OF ACTION

1.  This is an action for insurance bad faith arising under Florida Statutes §624.155.

## PARTIES, JURISDICTION AND VENUE

2.  Chicken Kitchen is a Florida company with its principal place of business at 10800 Biscayne Boulevard, Miami, Florida 33161.

3.  Maiden is a North Carolina company with its principal place of business at 6000 Midlantic Drive, Mount Laurel, New Jersey 08054.

4.  This Court has jurisdiction pursuant to 28 U.S.C. §1332(a) because there is complete diversity of citizenship and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

5.  This Court has personal jurisdiction over Maiden pursuant to Florida Statutes § 48.193 (2014) because Maiden conducts, engages in, or carries on a business or business venture in Florida; contracted to insure a person, property, and/or risk located within this state at the time of contracting; caused injury to persons or property within this state arising out of an act or omission by Maiden outside this state while engaged in solicitation of service activities within this

---

[1] Chicken Kitchen has filed a Second Motion for Extension of Time to File Amended Complaint and Request for Sanctions. (DE 100) That motion seeks additional time to file the First Amended Complaint given Defendant's failure to produce discovery necessary for Chicken Kitchen to properly allege all allegations relating to Defendant's business practices. In an abundance of caution and in compliance with the Court's order dated December 3, 2015, (DE 99), Chicken Kitchen files this instant First Amended Complaint but asks that the Court consider giving Chicken Kitchen the opportunity to file an Amended Complaint after Defendant has complied with its discovery obligations, as set forth in DE 100.

state; and/or breached a contract in this state by failing to perform acts required by the contract to be performed in this state; and is engaged in substantial and not isolated activity within this state. Maiden has purposely availed itself of the jurisdiction of this Court by transacting business in this District and the State of Florida.

6. Venue is proper pursuant to 28 U.S.C. §1391(b) because a substantial part of the events and omissions giving rise to this Complaint occurred in this District.

## GENERAL ALLEGATIONS

7. Chicken Kitchen is the owner of the popular restaurant chain known as "Chicken Kitchen." Chicken Kitchen owns a federal trademark registration for the word mark CHICKEN KITCHEN, Registration No. 74272617 (the "Trademark"). The Trademark, related dress, and proprietary recipes have been in exclusive and continuous use by Chicken Kitchen in connection with the operation of its restaurants since at least November 1983.

8. Chicken Kitchen's restaurants are marketed and promoted through its unique and distinctive trade dress, which Chicken Kitchen has established through years of successful operation of its restaurants. Chicken Kitchen has invested substantial monies to associate its trade dress in the minds of the public as representing high quality food and restaurant services. An element of Chicken Kitchen's success is its restaurants' unique atmosphere and presentation.

9. As a direct and proximate result of Chicken Kitchen's extensive experience, care, and skill in operating its restaurants and developing and maintaining its unique business model, Chicken Kitchen has become widely known as a restaurant chain and has acquired a reputation for excellence. That reputation stems in part from Chicken Kitchen's renowned proprietary grilled marinated chicken recipe and other proprietary recipes, which, along with Chicken Kitchen's reputation, has produced significant profits for Chicken Kitchen.

10. On or about August 27, 1999, Chicken Kitchen Corporation entered into a Franchise Agreement with The McDonnough's Investment Group, Inc. ("McDonnough Investment Group"), whose principals are Rudyard A. McDonnough, Rudyard McDonnough, Jr., and Richard McDonnough (collectively the "McDonnoughs"). Exhibit A.

11. At all times material hereto, Chicken Kitchen is and was the assignee of, and acquired all franchise agreements from Chicken Kitchen Corporation, and, as such, stands in the shoes of Chicken Kitchen Corporation in all respects and for the purpose of enforcing the terms of the Franchise Agreement.

12. On or about March 2, 2002, pursuant to the Franchise Agreement, McDonnough Investment Group, as Franchisee, opened a Chicken Kitchen franchise restaurant at 11423 Southwest 40th Street, Miami, Florida 33165 (the "Franchise").

13. Chicken Kitchen and McDonnough Investment Group operated under the Franchise Agreement until its termination in November, 2007.

14. In or around June 2011, Three Chefs, by and through its principals and/or agents, the McDonnoughs, opened a competing restaurant named "3 Chefs and a Chicken," at 8195 Southwest 40th Street, Miami, Florida 33165, on the same street as the Franchise.

15. The 3 Chefs and a Chicken restaurant was essentially a replica of a Chicken Kitchen restaurant, which the McDonnoughs were operating under a different name without Chicken Kitchen's permission to avoid compensating Chicken Kitchen under the Franchise Agreement.

16. In addition to opening 3 Chefs and a Chicken near Chicken Kitchen's restaurant, Three Chefs and the McDonnoughs hired at least six Chicken Kitchen employees to run the new restaurant, and, upon information and belief, were using Chicken Kitchen's protected trade dress.

17.     On February 9, 2012, Chicken Kitchen brought an eight-count complaint against Three Chefs and the McDonnoughs for breach of contract, misappropriation of trade secrets, injury to business reputation, trade dress infringement, unfair competition, and violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201-213 (the "first lawsuit").

18.     On or about February 23, 2012, Three Chefs and the McDonnoughs notified Maiden of the first lawsuit and demanded that Maiden provide them a defense under a policy of general liability insurance coverage issued by Maiden for the period beginning June 28, 2011 and ending June 28, 2012 (the "Policy"). Exhibit B.

19.     Three Chefs is the named insured under the Policy.

20.     Under the terms of the Policy, Maiden agreed to pay those sums that Three Chefs became legally obligated to pay as damages because of, among other things, "personal and advertising injury," to which the insurance applied.

21.     Maiden was also obligated under the Policy to defend Three Chefs against any suit seeking damages for "personal and advertising injury."

22.     Under the terms of its contractual duties and those imposed on it by common and statutory law, Maiden had the responsibility to fully and completely represent the interests of the Three Chefs by providing a defense to Three Chefs.

23.     Three Chefs and the McDonnoughs requested that Maiden retain the legal services of their intellectual property counsel, Mr. Richard S. Ross, Esq., to defend Three Chefs and the McDonnoughs in the first lawsuit.

24.     Upon information and belief, Mr. Ross had made a formal appearance in the first lawsuit on behalf of Three Chefs and the McDonnoughs to remove that action to federal court.

25. On March 3, 2012, Mr. Ross, on behalf of Three Chefs and the McDonnoughs, removed the first lawsuit from state court to this court. *See Chicken Kitchen USA, LLC v. Three Chefs and a Chicken, Inc., et al.*, United States District Court for the Southern District of Florida, Case No. 12-cv-20891-PCH.

26. By letter dated March 19, 2012, Maiden denied a defense to the McDonnoughs on the ground that they were not named insureds under the Policy, but agreed to defend Three Chefs under a reservation of rights concerning coverage and indemnification.

27. Maiden would not cooperate with Three Chefs and the McDonnoughs in their choice of counsel. Instead, Maiden retained Sedgwick LLP to represent Three Chefs in the first lawsuit.

28. Because Maiden refused to pay for the services of Mr. Ross, Three Chefs and the McDonnoughs rejected the terms of that defense.

29. On July 25, 2012, Maiden filed a complaint for declaratory relief to determine whether the Policy provided liability coverage to Three Chefs and the McDonnoughs. *See Maiden Specialty Insurance Co. v. Three Chefs and a Chicken, et al.*, United States District Court for the Southern District of Florida, Case No. 12-cv-22724-JAL.

30. In its amended complaint, filed August 23, 2012, Maiden alleged no coverage on the ground that the first lawsuit did not concern "personal or advertising injuries" under the Policy.

31. By joint scheduling report filed September 21, 2012, Maiden, Chicken Kitchen, Three Chefs, and the McDonnoughs proposed that pleadings be amended not later than November 1, 2012. The court later set as the deadline, December 7, 2012.

32. Pursuant to an Assignment, Settlement Agreement, and Covenant Not to Execute or Record (the "Settlement Agreement") dated October 17, 2012, the parties to the first lawsuit

6

consented to the entry of final judgment for trade dress infringement "relating to [Three Chefs'] unprivileged imitation of the overall design and appearance, style of operation, websites and means of [Chicken Kitchen] carried out in the course of [Three Chefs'] advertising to attract and maintain the general public as customers for its goods and services," and to the dismissal of all other pending counts.

33. On November 7, 2012, Chicken Kitchen, Three Chefs, the McDonnoughs, McDonnough Investment Group, and Christian Mahe De Berdouare jointly moved for approval of the settlement.

34. Counsel for Three Chefs, the McDonnoughs, and McDonnough Investment Group verbally informed Maiden's counsel of the settlement that same day, November 7, 2012.

35. By letter dated November 9, 2012, counsel provided to Maiden's attorney copies of the joint motion, the proposed order approving consent judgment, and the settlement agreement.

36. On November 20, 2012, U.S. District Judge Paul C. Huck entered an order accepting the consent final judgment.

37. On December 20, 2012, Three Chefs and the McDonnoughs moved for summary judgment contending that trade dress infringement is an "advertising injury."

38. On December 28, 2012, Maiden moved for final summary judgment on the ground that it had not contested coverage for trade dress infringement and that all remaining issues were, therefore, moot. Maiden also argued that the above settlement was not authorized under the Policy and "constitute[d] a breach of the policy and void[ed] coverage."

39. On January 10, 2013, Maiden filed a reply in support of its dispositive motion and a motion to file a second amended complaint. In support of the latter, Maiden contended that events forming the basis of a new coverage defense arose in October and November 2012, when the

settlement agreement was entered into without its knowledge. Maiden argued that "this unauthorized settlement constitutes a breach of the policy and voids coverage."

40. On February 13, 2013, Maiden moved to withdraw and amend its summary judgment motion based on that ostensibly new coverage defense. The defendants opposed the motions on the ground that Maiden failed to show good cause for violating the scheduling order.

41. On June 4, 2013, U.S. District Judge Joan A. Lenard denied Maiden's untimely motion to amend for Maiden's failure to show good cause why it had not moved for leave to amend its Amended Complaint within the December 7, 2012 deadline set by the scheduling order, pursuant to Federal Rule of Civil Procedure 16(b)(4).

42. The Court found that Maiden did not act diligently in pursuing its claims when it failed to propound discovery regarding the existence of a settlement agreement in the first lawsuit despite having over three months to do so; the information supporting the proposed amendment had been available to Maiden prior to the December 7, 2012 deadline for amendment of pleadings; and, even after acquiring the information, Maiden delayed in seeking the amendment for over two months from the date when the defendants first provided Maiden with notice of the settlement. The Court also considered that Maiden sought to raise the new coverage issue for the first time after Three Chefs and the McDonnoughs filed a motion for summary judgment and after those defendants filed their response to Maiden's own motion for summary judgment.

43. The Court also found that the Policy provides coverage for trade dress infringement, stating that:

> because the Agreement and Order in the [first lawsuit] provides for judgment and damages for trade dress infringement occurring in advertising, the unambiguous language of the Policy provides coverage for such damages, and Plaintiff concedes coverage for such damages under the Policy, the Court finds insurance coverage exists for trade dress infringement occurring in advertising and

8

>> Defendants are entitled to summary judgment on Count I of the Amended Complaint.

44. Pursuant to that order, on June 14, 2013, the parties filed a joint status report whereby Chicken Kitchen expressed its intent to enforce and/or collect upon the consent judgment of $1.2 million for which Maiden is responsible as a result of the court's findings vis-à-vis the applicability of the Policy to the claims settled in the first lawsuit.

45. On July 26, 2013, Chicken Kitchen moved for the entry of judgment pursuant to Federal Rule of Civil Procedure 54(c).

46. By order dated March 13, 2014, Judge Lenard entered declaratory judgment in favor of Three Chefs, the McDonnoughs, and Chicken Kitchen against Maiden, finding that the allegations made by Chicken Kitchen against Three Chefs in the first lawsuit were "personal and advertising injuries" as defined by the Policy, and were therefore covered by the Policy. The Court further ordered that, "If Chicken Kitchen seeks a monetary judgment from [Maiden], it must bring a separate action or file a motion for monetary judgment in the [first lawsuit], . . . if appropriate."

47. On July 2, 2014, Chicken Kitchen filed a Civil Remedy Notice of Insurer Violations ("CRN"), filing number 262276, with the State of Florida Department of Financial Services (the "Department"), pursuant to Florida Statutes §624.155(3)(a), and served the CRN upon Maiden that same day. Exhibit C.

48. The CRN made clear that Chicken Kitchen, on assignment of rights from Three Chefs, was seeking the liability coverage Maiden owes Three Chefs for the underlying claims.

49. Judge Huck's Order Accepting the Consent Final Judgment states that Chicken Kitchen and Three Chefs consented to a $1.2 million judgment in Chicken Kitchen's favor.

50. However, Maiden has failed to make any payments to Chicken Kitchen, as the assignee of Three Chefs.

51. Maiden's wrongful acts, which have spanned a number of years and have occurred with consistent frequency, before, during, and after multiple litigations, indicate a general and unlawful business practice of ignoring the rights of its insureds. Upon information and belief, such unlawful practices have been exhibited by Maiden throughout the country.

52. For example, in or around 2011, Maiden sold an insurance policy to National Railroad Passenger Corporation ("Amtrak"), policy number S1LPY0151600S, with a policy period of December 1, 2011 to December 1, 2012, to protect against all risk of physical loss or damage to Amtrak's interest in all real and personal property.

53. In or around October 2012, Superstorm Sandy caused severe damage to the New York metropolitan area. Upon information and belief, the storm, which became the largest Atlantic hurricane on record, had a substantial impact upon critical physical assets of Amtrak in and around New York City, including tunnels, bridges, track systems and power stations.

54. Upon information and belief, these properties were essential to Amtrak's operation of trains along the Northeast Corridor ("NEC"), which is the busiest railroad in North America; these properties also are essential to commuter rail services provided by Long Island Railroad ("LIRR") and New Jersey Transit ("NJT") that are the City's lifeblood. The trains of both LIRR and NJT run on Amtrak's track and through Amtrak's tunnels.

55. Upon information and belief, during the storm, gale-force winds caused physical harm to Amtrak properties in a variety of ways. Tracks along the NEC were strewn with fallen trees and other debris; electrical and mechanical equipment, including at a power station in Kearney, New Jersey, were rendered useless by wind-driven water; and there was damage to the supports of a railroad bridge in Riverdale known as the Spuyten Duyvil Bridge, among other things.

56. Upon information and belief, a wind-driven storm surge inundated Amtrak's tunnels under the East River and the Hudson River with seawater for the first time in their more than one-hundred-year history. These tunnels provide the only means of passage into and out of Manhattan for any train operated by Amtrak, LIRR and NJT.

57. Upon information and belief, the East River Tunnel, which consists of four tubes, two ventilation shafts and other structures, was inundated at mid-river up to the crowns of two tubes. The tunnel under the Hudson River, known as the North River Tunnel ("NRT"), consists of two tubes, a ventilation shaft, an egress shaft and other structures. Both NRT tubes were inundated at mid-river above the height of the bench walls.

58. Upon information and belief, this storm surge, which was unprecedented, disabled the operations of Amtrak's signal and power systems within the tunnels and damaged various mechanical and electrical systems.

59. Upon information and belief, after the storm was over and the tunnels were dewatered, additional physical damage began to take place within each tunnel due to various forms of chemical attack. This damage was caused by highly reactive salts, principally chlorides and sulfates that had thoroughly infiltrated essential tunnel components and were not removed by the dewatering.

60. Upon information and belief, when the water was pumped out, the remaining chlorides and sulfates were exposed to oxygen and moisture in the air. This exposure caused the chlorides to attack the steel reinforcement in the bench walls and the iron rails of the track bed. It also caused the sulfates to attack the concrete itself. Due to such damage, which, upon information and belief, is ongoing, there already has been one bench wall incident that required emergency

repairs and led to train delays. (Bench walls are concrete and steel structures which are essential components of the tunnels.)

61. Upon information and belief, on or about November 2, 2012, Amtrak provided timely notice to Maiden that it had suffered and was suffering a variety of losses, both known and unknown. Amtrak commenced the complex process of identifying and quantifying the full scope of its losses, drawing upon the assistance and expertise of a public adjusting firm.

62. Upon information and belief, Maiden engaged an adjuster and inundated Amtrak with exhaustive requests for information and inspections. Amtrak responded to more than 80 extensive and detailed Requests for Information and opened its facilities to inspections by Maiden's representatives. Inspections at every damaged location have been done by Maiden's representatives, including multiple inspections on the tunnels alone.

63. Upon information and belief, despite Amtrak's good faith cooperation with Maiden's multiple requests and demands, Amtrak has been unable to recover more than a token amount of insurance proceeds from Maiden. Amtrak has received partial and interim payments of only approximately $30 million. These interim payments fall far short of the more than $1.1 billion in detailed, estimated losses that Amtrak provided to Maiden and its other insurers in response to the insurers' requests for such estimates.

64. In fact, upon information and belief, Maiden has taken the position affirmatively that Amtrak is not entitled to receive much, if anything, in excess of $125 million.

65. Upon information and belief, Maiden's failure to make or approve partial and interim payments of undisputed estimates and Maiden's exhaustive demands for information that have interfered with and delayed the recovery process. Maiden's failure to meet its obligation to

Amtrak under the policy have had a substantial impact on the hundreds of thousands of people who travel daily on the NEC, the LIRR and NJT, and upon the economy of the region as well.

66. Yet Maiden, upon information and belief, together with several other insurance companies, has paid to Amtrak a total of only approximately $30 million, substantially less than needed to remedy the damages, causing Amtrak to suffer ongoing business interruption and other losses in connection with the storm. This was despite Amtrak's submission of documentation evidencing approximately $54 million in preliminary and partial losses.

67. Maiden's unlawful acts and omissions with respect to Amtrak demonstrate Maiden's general business practice of recklessly disregarding the rights of its insureds, as well as the consequences to others. Such willful and reckless disregard was also displayed by Maiden with respect to Giuffre Hyunadai Ltd., Giuffre AutoGroup LLC d/b/a/ Giuffre Mazda, Giuffre Motor Car Co. LLC d/b/a Giuffre Kia, Giuffre Italian Cars Inc. d/b/a Giuffre Fiat, and Giuffre Automotive Inc. d/b/a Giuffre Dodge & Ram (collectively "Giuffre"), which operate automobile dealerships in Brooklyn, New York.

68. Upon information and belief, Giuffre suffered severe damages as a result of Superstorm Sandy. Specifically, the storm caused a surge which engulfed a storage lot containing hundreds of Giuffre's vehicles located at 29th Street and Second Avenue, Brooklyn, New York. The storm surge ultimately resulted in the loss of 358 vehicles in Giuffre's automobile inventory.

69. Upon information and belief, Giuffre submitted a claim to their insurer, Maiden, under policy number PMINT5000845-12, entitled Motors Inventory Coverage, with a policy period of May 9, 2012 to May 9, 2013.

70. Upon information and belief, Maiden determined that each of the 358 vehicles was covered and each was a total loss under the policy. However, Maiden only paid a portion of the

claim. Among other things, Maiden did not pay $890,000, which it wrongfully asserted was the sum allocable to a flood deductible.

71. Such a failure by Maiden to meet its obligations to its insured further displays Maiden's general business practice of ignoring the rights of its insureds in the interests of, among other things, increasing Maiden's bottom line.

72. Chicken Kitchen has satisfied all conditions precedent to bringing this action.

73. Chicken Kitchen has employed the undersigned firm to represent its interests in connection with this lawsuit and the above described underlying disputes, and is obligated to its attorneys for the payment of their fees and costs.

## COUNT I
### Statutory Bad Faith

74. Chicken Kitchen realleges and incorporates by reference the allegations contained in paragraphs 1 through 73, as if fully set forth herein.

75. As a result of the foregoing allegations, whether taken separately or together, Maiden has:

    a. failed to attempt in good faith to settle Three Chefs' claims when, under all the circumstances it could and should have done so, had it acted fairly and honestly toward Three Chefs and with due regard for Three Chefs' interests, a violation of Florida Statutes §624.155(1)(b)(1);

    b. failed to adopt and implement standards for the proper investigation of Three Chefs' claims, a violation of Florida Statutes §626.9541(1)(i)(3)(a);

    c. misrepresented pertinent facts or insurance policy provisions relating to coverages at issue under the Policy, a violation of Florida Statutes §626.9541(1)(i)(3)(b); and

14

      d.    denied Three Chefs' claims without conducting reasonable investigations based on available information, a violation of Florida Statutes §626.9541(1)(i)(3)(d).

76. As a direct, foreseeable, and proximate result of Maiden's bad faith, Chicken Kitchen has suffered and will continue to suffer damages.

**WHEREFORE**, Plaintiff Chicken Kitchen USA, LLC, as assignee of Three Chefs and a Chicken, Inc., demands judgment against Defendant Maiden Specialty Insurance Company for damages, attorneys' fees, costs, pre-judgment interest, and any further relief that this Court deems just and proper.

## COUNT II
### Common Law Bad Faith

77. Chicken Kitchen realleges and incorporates by reference the allegations contained in paragraphs 1 through 73, as if fully set forth herein.

78. Pursuant to contract and common law, Maiden owed duties of good faith to Three Chefs, including, but not limited to, the following:

      a.    To use toward Three Chefs the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his or her own business;

      b.    To make all decisions regarding both litigation and settlement of the claims against Three Chefs in good faith and with due regard for the interests of Three Chefs;

      c.    To place Three Chefs' interests on at least equal footing as its own and to protect Three Chefs against exposure to an excess judgment;

      d.    To thoroughly investigate the claims against Three Chefs, and to do so promptly and without delay;

    e.    To thoroughly evaluate the claims against Three Chefs and the potential risks to Three Chefs, and to do so promptly and without delay;

    f.    To give fair consideration to the documentation, information, and reports provided to Maiden to evaluate Three Chefs' liability, damages, the substantial possibility of an excess judgment, and settlement offers;

    g.    To give fair consideration to settlement offers that are not unreasonable under the facts, and to provide its consent to settle where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so; and

    h.    To not unreasonably withhold its consent to fund a reasonable settlement within policy limits where liability and significant damages at issue made a judgment against Three Chefs in excess of limits under the Policy likely or reasonably certain.

79. Maiden breached its duties of good faith owed to Three Chefs by failing to properly and promptly investigate or evaluate Chicken Kitchen's claims, by failing to provide Three Chefs with a defense, by failing to make all decisions regarding both litigation and settlement of the claims in good faith and with due regard for the interests of Three Chefs, and by failing to offer its policy limits where liability and significant damages at issue made an excess judgment likely or reasonably certain.

80. Maiden thereby destroyed any possibility of settling Chicken Kitchen's claims within the policy limits at a time when all serious doubts about Three Chefs' liability were removed.

81. Maiden knew that the Policy obligated it to provide an investigation, defense, and/or settlement of any claims, but consciously and intentionally made a decision to deny a defense to Three Chefs.

82. Maiden's recurrent tortious misconduct was intentional, dishonest, and deliberately calculated to put its interests before those of Three Chefs, or, at the very least, was grossly negligent and in reckless disregard for Three Chefs' best interests.

83. As a direct, foreseeable, and proximate result of Maiden's bad faith, Chicken Kitchen has suffered and will continue to suffer damages.

**WHEREFORE**, Plaintiff Chicken Kitchen USA, LLC, as assignee of Three Chefs and a Chicken, Inc., demands judgment against Defendant Maiden Specialty Insurance Company for damages, attorneys' fees, costs, pre-judgment interest, and any further relief that this Court deems just and proper.

### COUNT III
### Punitive Damages

84. Chicken Kitchen realleges and incorporates by reference the allegations contained in paragraphs 1 through 73, 75 through 76, and 78 through 83, as if fully set forth herein.

85. The acts complained of in paragraphs 18 through 73, 75 through 76, and 78 through 83, constituted Maiden's general business practices in that such acts: (a) were expressions of, and in compliance with, standard company practices and procedures; (b) are claimed by Maiden to be in conformity with what it contends are standard and good faith claims practices; and, consequently or incidentally; and/or (c) occur with such frequency as to indicate general business practices.

86. Maiden's wrongful acts, which, in the instant dispute, have spanned a number of years and have occurred with consistent frequency, before, during, and after multiple litigations, as more fully explained above, including in paragraphs 26 through 30, 38 through 43, and 50,

indicate a general and unlawful business practice of ignoring the rights of its insureds, which unlawful practices have been exhibited by Maiden throughout the country, as more fully explained in paragraphs 52 through 70.

87. Maiden's failure to meet its obligations to its insureds displays a general business practice of ignoring the rights of its insureds in the interests of, among other things, increasing Maiden's bottom line.

88. Maiden's actions with respect to Three Chefs and Chicken Kitchen have been in reckless disregard for the rights of its insured.

89. As a direct, foreseeable, and proximate result of Maiden's bad faith, Chicken Kitchen has suffered and will continue to suffer damages.

**WHEREFORE**, Plaintiff Chicken Kitchen USA, LLC, as assignee of Three Chefs and a Chicken, Inc., demands judgment against Defendant Maiden Specialty Insurance Company for damages, punitive damages, attorneys' fees, costs, pre-judgment interest, and any further relief that this Court deems just and proper.

## TRIAL BY JURY

Chicken Kitchen demands trial by jury of all issues so triable as a matter of right.

Dated: Miami, Florida
December 17, 2015

Respectfully submitted,

ZARCO EINHORN SALKOWSKI & BRITO, P.A.
*Counsel for Plaintiff*
Miami Tower
100 S.E. 2nd Street, Suite 2700
Miami, Florida 33131
Telephone (305) 374-5418
Facsimile (305) 374-5428

By:   s/ Gabriel Estadella
        Robert Zarco (502138)
        rzarco@zarcolaw.com
        Alejandro Brito (98442)

reinhorn@zarcolaw.com
Gabriel E. Estadella (32094)
gestadella@zarcolaw.com
*Counsel for Plaintiff*
*Chicken Kitchen USA, LLC*

## **CERTIFICATE OF SERVICE**

I certify that the foregoing was served on all counsel of record via the court's ECF system on December 17, 2015.

s/ Gabriel Estadella<br>
Gabriel Estadella 32094